UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                )
UNITED STATES OF AMERICA,       )
                                )
      v.                        )
                                )    Criminal No. 03-188 (RWR)
CELICIA HOOVER-RANKERSON,       )
BENJAMIN HOOVER,                )
                                )
          Defendants.           )
                                )
```

## MEMORANDUM OPINION AND ORDER

A trial jury convicted defendants Celicia Hoover-Hankerson and Benjamin Hoover of conspiracy, two counts of theft from programs receiving federal funds and two counts of fraud in the first degree. That same day, the defendants moved for arid were granted, a two-week extension of time under Federal Rule of Criminal Procedure 29(c)(1) to renew their motions for judgment of acquittal. Both defendants timely moved for judgment of acquittal, arguing that the government failed to produce sufficient evidence to convict them. Both defendants also moved 'at the end of that two-week period for a new trial under Rule 33. Because the court lacks jurisdiction to entertain defendants' new trial motions, those motions will be denied. Because the government produced sufficient evidence to sustain the verdicts rendered against both defendants on Counts 1, 2, 4, and 5, and against Hoover-Hankerson on Count 3, defendants' motions for judgment of acquittal will be denied as to those counts. Because

- 2 -

the government did not produce sufficient evidence to prove

Count 3 against Hoover, judgment of acquittal will be granted on

that count **as** to him.

### BACKGROUND

The defendants were indicted for conspiracy to commit theft

from a witness voucher program receiving federal funds in

violation of 18 U.S.C. § 371 (2000) (Count 1); theft from a

witness voucher program receiving federal funds and aiding and

abetting, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2 (Count

2); theft from an investigator voucher program receiving federal

funds and aiding and abetting, in violation of 18 U.S.C.

§§ 666(a)(1)(A) and 2 (Count 3); and fraud in the first degree

with respect to the witness vouchers and investigator vouchers,

in violation of D.C. Code §§ 22-3821(a), 22-3822(a)(1)(1981)[1]

(Counts 4 and 5 respectively). The following evidence, recited

in the light most favorable to the verdict, see United States v.

Campbell, 702 F.2d 262, 264 (D.C. Cir. 1983), was produced during

the course of the seven-day trial.

I.   WITNESS VOUCHERS

An indigent criminal defendant entitled to appointed counsel

pursuant to the Criminal Justice Act ("CJA") may have a defense

---

[1] The indictment cites the 1981 edition of the D.C. Code.
These statutes appear in the 2001 edition at D.C. Code §§ 22-
3221(a) and 22-3222(a)(1).

- 3 -

witness paid a witness fee by check drawn on public funds under District of Columbia Superior Court Rule of Criminal Procedure 1 1 3 Attorneys appointed by the court may obtain blank witness fee vouchers from the court's voucher office for use in the defense of indigent criminal defendants.  The voucher office will not release blank witness vouchers to non-attorneys.  The attorneys must present identification, sign a log book for the vouchers issued, and safeguard the vouchers that they sign out. After January 28, 2002, the District of Columbia courts revised their policies to better implement Rule 113 by requiring any attorney requesting a witness voucher to present supporting documentation, such as a subpoena, to certify that the witness was compelled to attend court proceedings.  Attorneys report when vouchers are lost and stolen.  The court will void a lost or stolen voucher and notify its internal audit groups.

To be paid, the witness must certify on a witness voucher that he was compelled by subpoena to attend as a witness on behalf of the defendant and did attend the criminal case.  The defense lawyer also must sign the voucher certifying the witness's attendance.  The witness fee is $40.00 for one day's attendance.

Hoover-Hankerson, a CJA attorney, signed out 2,087 witness vouchers under the District of Columbia Superior Court CJA

- 4 -

voucher program between October 1, 1998 and February 7, 2001.
The average number of such vouchers signed out by CJA attorneys
during the same time period was 61.   Hoover-Hankerson did not
report that any vouchers signed out by her were lost or stolen.

Superior Court voucher office employee Vicki Jeter came to
know Hoover-Hankerson because of the frequency with which Hoover-
Hankerson would appear to sign out vouchers.   Jeter stated that
Hoover-Bankerson signed out more vouchers than any of the other
attorneys,  at times twice in one week or every other day.   Jeter
sometimes saw Hoover or Troy Robinson, both defense
investigators,  accompanying Hoover-Hankerson when she signed out
vouchers.   Employee Beatrice Pearson saw Hoover-Hankerson
accompanied by Hoover on some occasions when Hoover-Hankerson
signed out vouchers.   Robinson testified that he and Hoover had
passed out false witness vouchers from 1998 to 2002.

The jury heard from several individuals who cashed witness
vouchers that had been issued in blank by the voucher office to
Hoover-Bankerson and purportedly signed by Hoover-Hankerson
before being cashed.   Antonio Brown had received witness, vouchers
on a number of occasions from Robinson, a childhood acquaintance.
At Robinson's direction, Brown would sign and take the vouchers
to the Superior Court to cash them.   He would receive a $40.00
check for a voucher and after cashing it, keep $15.00 (or half)

- 5 -

and turn over the remainder to Robinson on 17th Street.   Brown

would see Hoover with Robinson when Robinson handed Brown

vouchers and when Brown turned over some of the proceeds.   Brown

heard Hoover referred to as "Ben."   Brown had never been,

subpoenaed for or appeared as a witness in the cases which were

the subjects of the vouchers.   The signature lines for the

certifying attorneys on his vouchers contained what appeared to

him to be the same signature.   He had never met Hoover-Hankerson,

and he did not know the source of Robinson's vouchers.

Marvin Brown had known Robinson for decades, but did not

know Hoover-Hankerson.   Robinson or Hoover would give Marvin

Brown witness vouchers at either 17th and Euclid Streets'or near

the Superior Court buildings.   Marvin Brown had never been

subpoenaed for a case and he never appeared in a case.   He had

seen Robinson and Hoover together on multiple occasions when he

would get vouchers.   He had also seen Hoover pass out vouchers to

other individuals in the 17th and Euclid Streets area.   Marvin

Brown would cash the vouchers, keep $15.00 or $20.00 per voucher,

and give the rest to whoever had given him the voucher.   He gave

Hoover proceeds from one voucher in front of a liquor store on

6th Street.'

---

² Marvin Brown admitted on cross-examination that he had
stated previously that he had never met Hoover.   Marvin Brown
explained that he drew a distinction between meeting someone and
"seeing" him.

- 6 -

Michael Taylor also cashed witness vouchers for cases for which he was never subpoenaed and for which he never appeared. His first involvement with witness vouchers occurred when Robinson approached him to meet at 601 Indiana Avenue to get the vouchers.   There were eight to ten individuals there, including Hoover.! The entire group walked over to the Superior Court to cash the vouchers and took the checks to a local liquor store. Taylor kept $15.00 per voucher and gave the rest to Robinson. Hoover was there when Taylor returned some of the voucher proceeds to Robinson.   Hoover accompanied Taylor to the liquor store on more than one occasion to cash the checks.   Taylor saw others give Hoover voucher proceeds four to five times.

Taylor saw Hoover and Robinson together at 601 Indiana Avenue eight to ten times when he went there to obtain vouchers. He saw Hoover-Hankerson on four to five separate occasions when Robinson or Hoover would go into a room with Hoover-Hankerson and return to Taylor with vouchers.   Taylor never had direct interaction with Hoover-Hankerson, and Robinson and Hoover never spoke directly to Hoover-Hankerson in his presence.   However, Taylor noticed that Hoover, Robinson, and Hoover-Hanker&n would engage in secretive behavior and close the door each time they went into the office.

- 7 -

The government introduced paid witness vouchers that purported to have the name Hoover-Hankerson signed on the signature line for the attorney.  Handwriting expert Brittany King opined that 471 of 864 attorney signatures on 427 different vouchers were written by the same individual.  King concluded that similarities in an additional 382 of the signatures suggested that those signatures were written by the same individual.  Her examination was inconclusive as to eleven of the 864 attorney signatures.

Hoover was employed, as an investigator in Washington, D.C. by his wholly owned business, Hoover Investigations.  In addition, he was variously employed at three other locations in Maryland: E and G Classics, Victor Cullen Academy, and St. Bernardine Catholic School.  There were 246 witness vouchers signed out from the voucher office with the name Hoover-Bankerson appearing in the log book attorney signature column that were ultimately processed for payment from October 5, 1998 to December 11, 2001 certifying that Hoover had appeared as a witness in a case.  Hoover did not submit any witness vouchers after the Superior Court revised its policies on January 28, 2002 requiring an attorney seeking to obtain a blank witness voucher to first produce proof that a witness had in fact been compelled to testify.  Among the appearance dates and times

- 8 -

listed on those vouchers were at least eight dates and times on which Hoover's time and attendance log at one of his Maryland places of employment reflected Hoover's presence there.

Hoover-Hankerson's husband, Ernest Hankerson, was employed in Harrisburg, Pennsylvania.  He submitted 328 witness vouchers with her name signed on them.  Two hundred ninety-four of those vouchers claimed appearances at times when his time and attendance records at his Pennsylvania job reflected his presence there.

II.   INVESTIGATOR VOUCHERS

Investigators assisting CJA attorneys in CJA qualified cases may be paid using investigator vouchers.  On an investigator voucher, the attorney has to certify that the work completed by an investigator was completed satisfactorily.  The government introduced evidence of numerous investigator vouchers submitted by Hoover's investigation corporation and by Ernest Hankerson, Hoover-yankerson's husband, bearing what purported to be signatures of 'Hoover-Hankerson.  (Gov't Ex. 9e-1, 9c-2.) Investigator Diane Eickman testified that 32 of the investigator vouchers claimed that Hankerson had conducted investigatory work during certain times that his attendance log for employment in Harrisburg, Pennsylvania reflected him at work there.  Similarly, Eickman testified that eleven of Hoover's investigator vouchers

claimed investigative work at times when his time and attendance records, at Victor **Cullen** Academy and St. Bernardine reflected Hoover's presence in Maryland. (**See** Gov't Ex. **9f.**) Hoover submitted those eleven vouchers between February 27, 2002 and February 27, 2003 claiming a total of **$3,962.37.** Hankerson submitted sixteen such vouchers between February 27, **2001** and February 27, 2002 claiming a total of **$2,404.40,** and submitted twelve such vouchers between February 27, 2002 and February 27, 2003 claiming a total of **$4,325.89.**

III. MOTIONS

Just after the jury delivered its verdicts, **counsel** for defendant Hoover requested an extension of at least fourteen days to **file** a motion for judgment of acquittal notwithstanding the jury verdict. Counsel specified that he based his request on Rule **29.** Counsel for Hoover-Hankerson joined in that **motion** without, further comment. The government did not oppose. The court engaged defendant Hoover's counsel in a discussion about the court's discretion to grant an extension of time to file a motion for judgment of acquittal: Counsel repeatedly identified Rule 29 as the authority to grant an extension of time. **Before** the court agreed to the motion for an extension of time, counsel was questioned whether any other seven-day limit in the rules governed the discretion to award an extension. Counsel replied

- 10 -

that it was indeed Rule 29(c)(l).  The court stated that it would

extend the "seven-day period to fourteen days [in] which to allow

both defendants to file a post-verdict Rule 29 motion." (Tr. of

7/8/04, afternoon session, at 36.)  Hoover filed on the

fourteenth day a motion for judgment of acquittal and/or 'for a

new trial.  Hoover-Hankerson filed a motion for judgment of

acquittal on the fourteenth day and submitted a suppleme: tal

motion for a new trial on the fifteenth day.

## DISCUSSION

I.   MOTION FOR JUDGMENT OF ACQUITTAL

Federal Rule of Criminal Procedure 29(c) (1) states hat "[al

defendant may move for a judgment of acquittal, or renew such a

motion, within 7 days after a guilty verdict or after th court

discharges the jury, whichever is later, or within any o her time

the court sets during the 7-day period."  A court lacks uthority

to entertain a motion for judgment of acquittal if it is untimely

filed.  See Carlisle v. United States, 517 U.S. 416, 421 (1996).

If the motion is timely made, "[t]here is only one groun for a

motion for judgment of acquittal.  This is that the evid nce is

insufficient to sustain a conviction of one or more of tl e

offense s charged in the indictment or information."  2A harles

Alan Wright, Federal Practice & Procedure: Criminal § 461 (3d ed.

2000) (footnote and internal quotations omitted).

- 11 -

In determining the sufficiency of the evidence to sustain a conviction, 'after viewing the evidence in the light most favorable to the prosecution, [a court must determine whether] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). Because a court must recognize the "right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact," <u>United States v. Edmonds</u>, 765 F. Supp. 1112, 1116 (D.D.C. 1991) (quoting <u>United States v. Reese</u>, 561 F.2d 894, 898 (D.C. Cir. 1977)), and 'presume that the jury has properly carried out its functions of evaluating the credibility of witnesses," <u>Campbell</u>, 702 .2d at 264, a jury determination will stand unless 'no reasonab e juror could accept the evidence as sufficient to support the c nclusion of the defendant's guilt beyond a reasonable doubt." <u>Id.</u> "'[W]hen a reasonable mind might fairly have a reasonable doubt of guilt or might fairly have none, the decision is for the jury to make.'" <u>Edmonds</u>, 765 F. Supp. at 1116 (quoting <u>United States v. Herron</u>, 567 F.2d 510, 514 (D.C. Cir. 1977)). Moreover, "there is no requirement of any direct evidence of guilt if there exists sufficient circumstantial evidence to support the verdict[,]" <u>id.</u> (quoting <u>United States v. Poston</u>, 902 F.2d 90, 94 n.4 (D.C. Cir. 1990)), though a jury 'cannot be permitted to speculate if the

- 12 -

evidence" is so scant and insubstantial that a guilty verdict would be unreasonable. 2A Charles Alan Wright, <u>Federal Practice & Procedure</u> : Criminal § 467.

A. <u>Conspiracy</u>

The defendants were charged with and convicted of conspiracy to commit theft from the witness voucher program. Hoover-Hankerson argues that there is insufficient evidence to show that she "actually reached an agreement with any alleged coconspirator," and argues that the government's own witnesses "specifically testified that they had no agreement with . . . Hoover-Hankerson . . . [and had not] provided any proceeds from the witness'[s] vouchers to [her]." (Hoover-Hankerson's Mot. to Set Aside the Conviction and P. & A. in Supp. ("CHH Mot."" at 9.) Hoover likewise argues that the government failed to establish that there "was an agreement between [him] and any other individual charged in the indictment to commit theft" or that he knowingly and intentionally joined in any agreement. (Hoover's Mot. for J. of Acquittal &/or New Tr. ("BH Mot.") at 2.) Hoover argues that the evidence showed only that he was in the neighborhood where the witness fee vouchers were handed out by Robinson. (<u>Id.</u> at Z-3.)

'In order to convict a defendant of conspiracy under 18 U.S.C. § 371, a jury must find that the defendant entered into an

- 13 -

agreement with at least one other person to commit a **specific offense** . . . as well as that the defendant knowingly participated in the conspiracy with the intent to commit the **offense** and that at least one overt act was committed in furtherance of the conspiracy." <u>United States v. Gatling</u>, 96 F.3d 1511, 1518 (**D.C.** Cir. 1996). 'In order to prove that an agreement existed, the government need only show that the conspirators agreed on the essential nature of the plan, not that they agreed on the details of their criminal scheme. It is well established that an agreement sufficient to support a conspiracy conviction can be inferred from circumstantial evidence." <u>Id.</u> (internal quotations and citations omitted); <u>see also United States v. Pemberton</u>, 121 **F.3d** 1157, 1166 (8th Cir. 1997).

From the evidence offered at trial, a reasonable jury could have found that an agreement existed between Hoover and Hoover-Hankerson and others to commit theft from the witness voucher program) It is of no moment that there may have been, as the defendants contend, little direct evidence of an agreement or the defendants' knowing joinder in that agreement, for "[i]t is unusual to have direct evidence of the conspiracy. Circumstantial evidence, including inferences from a development and a collection of circumstances, suffices to prove participation in a conspiracy." <u>Edmonds,</u> 765 F. Supp. at 1116

- 14 -

(internal quotations omitted). Here, the evidence established that Hoover-Hankerson signed out 2,047 witness vouchers over a period of time when the average number of vouchers signed out by other CJA attorneys was 61, that her signature appeared on fraudulent vouchers submitted by Taylor, Antonio Brown and Marvin Brown, and that Taylor, Antonio Brown and Marvin Brown each received their vouchers from either Robinson or Hoover. Taylor testified that he saw Hoover-Hankerson, Hoover and Robinson together shortly before he received a number of vouchers, and that they behaved secretively.

A reasonable juror could have found that Hoover and Hoover-Hankerson agreed to commit theft knowingly and intentionlly from numerous factors: the secretive interaction among Hoover-Hankerson, Hoover and Robinson immediately preceding Taylor's receipt of witness vouchers; Robinson and Hoover's acceptance of proceeds from fraudulent vouchers; Hoover-Hankerson's signatures on the vouchers"; and the fact that only attorneys could sign out

_____

[3] Hoover-Hankerson argues that the lack of conclusive identification by the handwriting expert as to each of the 2,047 vouchers renders the evidence insufficient to prove that Hoover-Hankerson committed or agreed to commit witness voucher theft or fraud. A reasonable jury could easily reject that argument given the plethora of signatures the handwriting expert did identify as Hoover-Hankerson's from among just the sample of the vouchers examined. Moreover, the jurors were free to decide for themselves by looking at the vouchers admitted in evidence whether the signatures are consistent and uniform. See, e.g., United States v. Oskowitz, 294 F. Supp. 2d 379, 384 (E.D.N.Y. 2002) (noting that jurors can make a conclusion as to authorship

the vouchers from the Superior Court and that Hoover-Hankerson had not reported any of the 2,047 vouchers missing or stolen. Although Antonio Brown, Marvin Brown and Taylor each testified that he had not made any agreement or interacted with Hoover-Hankerson directly, a reasonable juror could infer from the evidence that Hoover-Hankerson signed out vouchers and passed them on to Hoover and others to distribute to individuals in the 17th and Euclid Streets neighborhood to cash. In any case, in a criminal conspiracy, "the government need only show that he conspirators agreed on the essential nature of the plan, not that they agreed on the details of their criminal scheme[,]" c knew the identity of all the co-conspirators. <u>Gatling</u>, 96 F.: at 1518 (internal quotations and citations omitted); <u>see als</u> <u>United States v. Guerra-Garcia</u>, 336 **F.3d** 19, 23 (1st Cir. 2003) "A defendant need not have knowledge of all the details of t e conspiracy, the participants in the conspiracy, or their cts.").

In addition, the very fact that Hoover himself submi ted witness vouchers on at least eight different occasions wh ch conflicted with times when he had signed in at work outsi e of the District of Columbia could support the inference that Hoover knowingly agreed to commit theft. While Hoover-Hankersol may

---

based on their own experiences with the aid of an expert ho testifies as to how similarity is judged in handwriting mples).

- 16 -

claim that when she obtained the witness vouchers, she did not

know or agree that witnesses would fraudulently fill out the

vouchers, it was entirely reasonable for a juror to conclude that

Hoover-Hankerson knowingly distributed those vouchers to

individuals who would pass them on to others who were no

compelled to appear in court.  See, e.g., Pemberton, 121 F.3d at

1167 ("In particular, [the defendant's] signature on the

auditor s representation letter, which contained the fal e

statement . . . reasonably could lead the jury to the inference

that [the defendant] intended to mislead the auditor and the

Interior Department.  [The defendant] suggests that he did not

know that the statement was false, but the jury quite reasonably

could have determined that [he intended to commit fraud] .")  It

is not the task of the court to choose among competing inferences

that can be drawn from evidence.  "The traditional deference

accorded to a jury's verdict is especially important whe:

reviewing a conviction for conspiracy . . . because a co: spiracy

by its very nature is a secretive operation, and it is a rare

case where all aspects of a conspiracy can be laid bare in court

with the precision of a surgeon's scalpel."  United States v.

Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotations

omitted).   The evidence here is not so scant or meager s ch that

no reasbnabie juror could'have found the defendants guilty of

knowingly agreeing to commit theft.

    B.  <u>Theft and fraud:  witness vouchers</u>

    The defendants were charged in Count 2 with theft concerning

witness! vouchers and aiding and abetting, in violation of 18

U.S.C. §§ 666(a) (1) (A) and 2, and in Count 4 with fraud in the

first degree, in violation of D.C. Code §§ 22-3821(a), 22-

3822 (a)(1) (1981).  Conviction of theft requires proof that

(1) that defendants were "agent[s] of an organization, or of a

State [or] local . . . government, or any agency thereof';

(2) that defendants embezzled, stole, obtained by fraud,

knowingly converted, or intentionally misapplied property that is

"valued at $5,000 or more" from "such organization, government,

or agency"; and (3) that such "organization, government, or

agency receives, in any one year period, [federal assistance] in

excess of $10,000." 18 U.S.C. § 666(a)(1)(A); <u>see also</u> <u>United

States v. Cornier-Ortiz,</u> 361 F.3d 29, 33 (1st Cir. 2004) (setting

forth elements of theft).  First degree fraud is established upon

proof that the defendants "engage[d] in a scheme or systemic

course of conduct with intent to defraud or to obtain property of

another/by means of a false or fraudulent pretense,

represe'ntation, or promise and thereby obtain[ed] property of

another, or cause[d] another to lose property." D.C. Code § 22-

- 18 -

3821(a) (1981); <u>Bell v. United States</u>, 790 A.2d 523, 529 (D.C.

2002). "In order to aid and abet the commission of an offense, a

defendant must 'associate himself' with it, must 'participate in

it as in something that he wishes to bring about,' and must 'seek

by his action to make it succeed." <u>Campbell</u>, 702 F.2d at 265

(quoting <u>Nve & Nissen v. United States</u>, 336 U.S. 613, 619

(1949))I.

    Hoover argues that the government failed to establish that

at least $5,000.00 worth of witness voucher fees were obtained by

fraud, and that there is insufficient evidence to show that he

partici ated in the scheme to defraud knowingly, willfully, and

with in ent to defraud the witness voucher program.   Hoover also

argues that there was no evidence that he received any of the

proceeds of the funds and that it would be "illogical for [him]

to be involved in a scheme that only benefits people that he is

not acquainted with."[4]   (BH Mot. at 5.)

    A reasonable juror could have found that defendant Hoover

obtained or caused the Superior Court to lose by fraud over

$5,000.00 through false witness vouchers.   The government's

evidence showed that Hoover submitted 246 witness vouchers.   If

_____

    [4] For the same reason that defendant Hoover's sufficiency
challenge fails on the conspiracy count, defendant's assertion
that the government failed to prove that he knowingly
participated in a scheme to defraud the Superior Court with false
witness vouchers on Count 4 fails as well.

- 19 -

all of the vouchers were false, Hoover would have received
$9,840.00, well over the jurisdictional amount. A jury could
have inferred from Hoover's failure to submit a singlewitness
voucher after January 28, 2002 -- when the Superior Court changed
its procedures to require a copy of a subpoena for each witness
voucher it issued -- that each of the 246 witness vouchers was
fraudulent.[5] Coupled with Robinson's testimony that he and
Hoover did pass out false witness vouchers, and with evidence
from Taylor that Hoover, on occasion, accompanied Taylor to the
liquor store for a voucher handed to him by Robinson, that Taylor
saw Hoover distributing vouchers in the 17th and Euclid Streets
neighborhood, and that Hoover and Robinson often were seen
together as Robinson passed out vouchers, there is sufficient
evidence from which a reasonable juror could have found that
Hoover obtained by fraud, or caused the Superior Court to lose by

---

[5] In asserting that the jury was not allowed to hear the
allegation that he failed to submit a single witness voucher
after the Superior Court changed its procedures, Hoover
misrecollects the evidence that was admitted.  Government exhibit
51, which sets forth the policy for signing out witness vouchers
after January 2002, was admitted in evidence over defendant
Hoover's objection on June 28, 2004.  To the extent that Hoover
argues that had the policy change not been admitted in evidence,
the remaining evidence would have been insufficient to support a
conviction, that argument is not one proper for a Rule 29
challenge.  See United States v. Diaz, 300 F.3d 66, 77-78 (1st
Cir. 2002).  Under Rule 29, a court reviewing the sufficiency of
the evidence must consider all the evidence submitted to a jury,
"'regardless of whether it was properly admitted.'"  a . (quoting
United States v. Gonzalez-Sanchez, 825 F.2d 572, 588 (1st Cir.
1987)).

fraud, over $5,000 in witness voucher fees.  **See** <u>United States v.</u>

<u>Naiman,</u> 211 **F.3d** 40, 47-48 (**2d** Cir. 2000) (rejecting **defendant's**

argument that the government failed to prove that he had

misapplied more than $5,000 despite only circumstantial **evidence**

showing that the federal program did not receive the funds found

to have been misapplied by the defendant).

Hoover-Hankerson argues that there is insufficient evidence

to establish that she aided and abetted in the theft involving

witness vouchers because the government failed to prove that she

intended for anyone to succeed in committing **theft.**[6]  There is

ample evidence for a reasonable juror to conclude that Hoover-

Hankers'n had the intent to facilitate the commission of theft

by, at the least, Hoover and Robinson; that she knew tha. the

witness vouchers would be used to commit fraud; and that Hoover

and Robinson distributed the **vouchers in** the 17th and **Euclid**

Streets neighborhood to receive some of the proceeds themselves

A rational trier of fact could conclude that, by signing out

2,087 witness vouchers, well above the average number that CJA

attorneys obtained during the relevant time period, and

distributing them to investigators who had been seen passing them

_____

[6] Hoover-Hankerson does not raise in her renewed motion
insufficiency arguments regarding Count 4, fraud in the first
degree with respect to witness vouchers.  **However, for the same
reasons that** there is sufficient evidence to convict her on the
conspiracy count, there is sufficient evidence to **sustain** the
fraud conviction regarding witness vouchers.

- 21 -

out to investigators who would not be witnesses, Hoover-kankerson
actively assisted others in the commission of theft.
Furthermore, Hoover-Hankerson's husband submitted 294 witness
vouchers with her name signed on them which conflicted with his
time an'd attendance records at his Pennsylvania job.   Taylor also
testified that he saw Hoover-Hankerson, Hoover and Robinson
furtivehy meeting immediately before he was handed witness
vouchers to commit fraud.   A juror could reasonably infer from
the evidence that Hoover-Hankerson actively facilitated the
commission of theft by signing out vouchers which she knew would
be cashed fraudulently.   See, e.g., Poston, 902 F.2d at 55
(finding circumstantial evidence sufficient to convict defendant
of aiding and abetting another's possession of drugs).

        C.   Theft and fraud:   investisator vouchers

        Hoover-Hankerson argues that there is little evidence to
show that she was part of a joint effort to commit theft with
investigator vouchers, and that the fraud count based on
investigator vouchers must also fail for failure to prove knowing
and willful participation in such fraud.   Specifically, she
argues that there was no direct evidence that she was aware that
Hoover or Hankerson had not performed the investigator services.
(CHH Mot. at 12-13.)   There is sufficient evidence, however, to
infer that Hoover-Hankerson knew that the investigator vouchers

- 22 -

submitted by her husband and Hoover were false.  Governmt nt exhibits Yc-2 and Ye-2 detail conflicts in the time clair ed on Hoover and Hankerson's investigator voucher submissions.  Given those time conflicts, the volume of vouchers, certificati ons bearing Hoover-Hankerson's apparent signatures that the s uspect investigator work was completed, and the extensive time p eriod over which the suspect vouchers were submitted, a ration: l juror could find that Hoover-Hankerson aided and abetted Hanker son and Hoover in their false submissions.  Similarly, this evide nce is sufficient to sustain a finding of knowing participation by her in investigator voucher fraud.

Likewise, there is sufficient evidence to show that defendant Hoover committed fraud in the first degree with respect to the investigator vouchers.  Voucher 1AX0006803 (Gov't Ex. 9e-2) alone satisfies the minimum $250.00 amount required to sustain the conviction, and the jury could have found that Hoover had intended to commit fraud by comparing the hours claimed c n the voucher to his time and attendance logs at his place of employment.[7]

---

[7] Although Hoover argues that the vouchers were subn itted on behalf of Hoover Investigations and that an investigator working for Hoover could have turned in those vouchers, the gove: nment need not counter every plausible innocent explanation.  See United States v. Patterson, 644 F.2d 890, 893 (1st Cir. : 981).

- 23 -

Hoover's theft conviction poses a more difficult question.
Hoover challenges whether the government proved the requisite
jurisdictional amount of loss for the theft charge related to
investigator vouchers.  Given that the total of the vouchers
submitted by Hoover amounted to $3,962.37, he argues that the
govern"nent failed to prove the $5,000.00 of loss required under
the statute.  The government argues that the evidence established
that $11,408.42 worth of vouchers were submitted by Hoover and
his "accomplice and coconspirator Ernest Hankerson."  (Gov't
Opp'n at 8.)  Because the government did not charge the
defendants with any conspiracy to commit investigator voucher
fraud, or allege at trial that such a conspiracy existed, it
cannot establish that the jury found such an agreement or use it
to attribute Hankerson's fraudulent conduct to Hoover.

Although a jurisdictional amount can be reached through the
conduct of aiders and abettors, the evidence here did not
establish that Hoover aided and abetted a principal or an
accomplice who, with Hoover, converted over $5,000.00 from a
program receiving federal funds.  The government provided no
evidence to show that Hoover aided and abetted -- that is,
actively facilitated -- Hankerson's investigator voucher fraud.
The government cannot use Hoover's membership in a conspiracy to
commit witness voucher fraud to prove that he aided and abetted

Hankerson in any purported separate and distinct investigator

voucher, scheme. **See** <u>United States v. Wiley</u>, 846 **F.2d** 150, 155

(2d Cir. 1988). Nor was there evidence that Hoover and **Hankerson**

helped each other in committing investigator voucher fraud. No

evidence was introduced that Hoover and Hankerson performed

investigative work together, met together with Hoover-Hankerson

just before or after their investigator vouchers were submitted,

submitted those vouchers together, commingled or shared the

proceeds of those vouchers, discussed with each other the

investigator voucher fraud scheme, or otherwise knew that each

other was involved in such a scheme. Drawing all reasonable

inferences in the government's favor from the evidence produced

at trial, there would be insufficient evidence to **convict** Hoover

of aiding and abetting **Hankerson**[8] as a principal or an accomplice

such that the jurisdictional amount could be reached.

Conceivably, Hoover could be culpable if Hoover-Hankerson

had one overarching scheme to distribute investigator vouchers to

both Hoover and Hankerson to defraud the Superior Court, as

opposed to separate schemes involving Hoover and Hankerson

independently; if Hoover knew that the investigator voucher

---

[8] Although one who aids and abets need not know the details
of the offense or even the identity of the principal, <u>United
States v. Staten</u>, 581 **F.2d** 878, 887 (D.C. Cir. 19781, there was
no evidence to show that Hoover's activities actively facilitated
those of Hankerson or furthered Hankerson's purposes.

scheme was broader than the eleven vouchers that he had
submitted; and if his submission of false investigator vouchers
actively facilitated Hoover-Hankerson's overarching scheme.    In
that circumstance, Hoover could be responsible not only for the
loss amounts attributable to the investigator vouchers submitted
by him, but also for the loss amounts attributable to th'
investigator vouchers submitted by Hankerson.    <u>See Unitl States
v. Cruz-Mercado</u>, 360 F.3d 30, 35 (1st Cir. 2004)(affirming
sentencing enhancement for $4.3 million in loss where defendant
was only directly responsible for $600,000 on the basis that
defendant was accountable for the full amount of loss of his
coconspirator), <u>cf.</u> <u>United States v. Osebv</u>, 148 F.3d 1016, 1025-
27 (requiring remand where the district court failed to make
specific findings to attribute the amount of loss from
coconspirators to the defendant for offense of conspiracy to
defraud the United States).    And; in that circumstance, it might
be that the amounts converted by Hankerson and Hoover could be
aggregated to reach the jurisdictional threshold.    The government
cites <u>United States v. Sanderson</u>, 966 F.2d 184 (6th Cir. 1992),
in support of its argument that amounts stolen through multiple
conversions here were in the course of carrying out a single
scheme and may be aggregated for the purposes of jurisdiction
under § 666(a)(1)(A).    While <u>Sanderson</u> notes that it is

- 26 -

appropriate to aggregate amounts converted by a single defendant in the course of his own scheme, <u>Sanderson</u> does not address the propriety of aggregating amounts taken by separate individuals acting independently to reach the jurisdictional threshold on the substantive charge, and the government cites to no **case which finds** conviction under those circumstances appropriate.

Moreover, the government's evidence was insufficient to prove that Hoover-Hankerson had one overarching scheme dependent upon both Hoover and Hankerson (and not separate schemes with each independently), or that Hoover knew that any investigator fraud scheme involved more than his eleven fraudulent vo **chers.** <u>See, e.g., United States v. Sampol</u>, 636 **F.2d** 621, 676 (D C. Cir. 1980) (permitting aiding and abetting liability even if  hat defendant did "not perform the substantive offense, [did] not know its details, and [was] not even . . . present, so long as the offense committed by the principal was in **furtherance** of the common **design**") (citations omitted); <u>cf. Wiley</u>, 846 **F.2d** at 155 (reversing conviction of defendant on aiding and **abetting** theory because there was insufficient evidence to show that he aided and abetted a large wire fraud scheme).  Unlike the evidence supporting the conviction for conspiring to commit witness voucher fraud, there is no evidence here from which the  urors could infer that Hoover thought Hoover-Hankerson engaged in a

- 27 -

broader investigator voucher fraud scheme.  While Taylor

testified about Hoover-Hankerson, Hoover and Robinson meeting

secretly before Taylor received his witness vouchers, and while

the volume and number of individuals submitting witness vouchers

bearing Hoover-Hankerson's signature is compelling, there is no

equival nt evidence involving investigator vouchers.'  See

Sampol, 636 F.2d at 676 (noting that an accomplice may be liable

for acts which are in furtherance of a common plan to commit a

felony or are the natural and probable consequences of acts done

in perpetrating the felony).  It is equally plausible that

Hoover-Hankerson aided and abetted Hoover and Hankerson

independently, or that Hoover-Hankerson ran two separate

investigator voucher schemes to defraud the Superior Court.

---

[9] In United States v. Webb, a jury rendered a guilty verdict
against a defendant on a § 666(a)(1)(A) charge where the
jurisdictional amount was met only after aggregating the value of
multiple conversions.  691 F. Supp. 1164, 1168 (N.D. Ill. 1988).
Because the court there had instructed the jury that it could
convict if it "found that 'property valued at $5,000 or more' was
'embezzled, stole[n] or otherwise converted to the use of persons
other than the rightful owners' -- without finding that the
theftw ere part of a single plan[,]" the court noted that a jury
couldah ve convicted without finding that a "single plan"
supported its verdict.  Id.  In that case, though the "error
ordinarily would require reversal of the guilty verdict," the
government's additional charge of conspiracy to defraud the
United States and the jury's finding of guilt on that conspiracy
charge permitted the court to state that the jurors "necessarily
found" that the thefts were part of a single scheme and uphold
the conviction.  Id. at 1168-69.  Here, there was no charge and
conviction of conspiracy to commit theft from the investigator
voucher program.

Hoover submitted investigator vouchers on four dates which
overlap; only minimally with the more extended period of
submissions by Hankerson.   That limited coincidence hardly
suffices to permit a reasonable inference that Hoover knew of and
actively facilitated a broader investigator voucher fraud scheme
reaching beyond him and Hoover-Hankerson to Hankerson such that
Hankerson's thefts should be attributable to Hoover.   The
evidence against Hoover on Count 3 was insufficient to permit a
rational trier to find beyond a reasonable doubt that Hoover was
responsible for converting over $5,000 in investigator voucher
funds.   See United States v. Ortiz, 445 F.2d 1100, 1103 (10th
Cir. 1971) (noting that a conviction cannot be based on ,evidence
that is consistent with both innocence and guilt).

II.   MOTION FOR A NEW TRIAL

     Federal Rule of Criminal Procedure 33 provides that a motion
for a new trial premised on grounds other than newly discovered
evidence must be made 'within 7 days after the verdict or fiinding
of guilty, or within such further time as the court may fix
during that 7-day period."   'If the defendant fails to make a
motion for a new trial within seven days and the court fails to
'fix' a new due date for the motion during that period, the court
loses jurisdiction and cannot grant such a motion at a later
time."   United States v. Marquez, 291 F.3d 23, 25 (D.C. Cir.

2002). "Rule 33 means what it says" and no court may entertain a motion for a new trial outside of the time limits set forth in Rule 33. Id.

Here, defense counsel timely preserved their right to move within seven days of guilty verdicts for judgments of acquittal by specifically invoking Rule 29. However, neither counsel asked for an extension of time to move for a new trial or mentioned Rule 33. Hoover's counsel unequivocally announced that his motion was made under the authority of Rule 29(c)(1). Despite being asked about other potentially relevant provisions of the -Federal Rules of Criminal Procedure that contained a seven-day time limit, counsel did not invoke Rule 33 or request an extension to file a motion for a new trial.

Moreover, the circumstances here do not fall within the narrow "unique circumstances" exception to the jurisdictional time limits. A defendant may move for a new trial outside o f Rule 33's strict time limits 'only when the cause of the failure to meet the deadline was 'an erroneous ruling or assurance by the District Court itself.'" Marquez, 291 F.3d at 26 (quoting Carlislk, 517 U.S. at 428). The parties never stated that the extension requested applied to any motion but one for judgment of acquittal. The court granted defendants an extension of the seven-day period to a fourteen-day period in which both

- 30 -

defendants could file a post-verdict Rule 29 motion, and gave no

indication that the ruling applied to any Rule 33 motion as well.

Accordingly, defendants' motions for new trials must be denied

because the court lacks jurisdiction to entertain them.

Even if the motions had been timely, defendants' grounds for

a new trial appear meritless.   Rule 33 provides that the trial

court may, upon motion by the defendant "vacate any judgment and

grant a new trial if the interest of justice so requires."   Fed.

R. Crim  P. 33(a); see United States v. Williams, 233 F.3d 592,

593 (D.C. Cir. 2000).   A Rule 33 motion charging ineffective

assistance of counsel must set forth evidence upon which the

elements of a constitutionally deficient performance might

properly be found.   United States v. Pinkney, 543 F.2d 908, 915

(D.C. Cir. 1976).   Hoover argues that he deserves a new trial

because he was denied the effective assistance of counsel when

his motion to continue the trial was denied.   Hoover claims the

denial prevented him from obtaining witnesses that would

corroborate the fact that other investigators worked for Hoover

Investigations, Inc.   However, in his motion for a continuance,

Hoover mentioned no difficulties in obtaining such witnesses, and

he now fails to identify who the witnesses are or how they would

corroborate the fact that other investigators worked for Hoover

Investigations.   Cf. Poston, 902 F.2d at 98 ("Mere assertions

- 31 -

regarding the utility of prospective testimony do not provide a
sufficient basis to compel a continuance [where] there is no
indication that [the] testimony would have been material and
favorable . . . ."); Tabor v. United States, 175 F.2d 55 , 553
(4th Cir. 1949) (denying motion for new trial based on absence of
witnesses where the only proffered testimony would not have
affected result).   Similarly, Hoover-Hankerson argues that she
was denied the aid of a handwriting expert and a financial expert
by the denial of her motion to continue the trial.   In her motion
to continue, Hoover-Hankerson failed to articulate how
specifically the purported missing witnesses would be helpful and
fails to do so here as well.   Moreover, neither defendant offers
any explanation for why he or she could not secure these
additional witnesses in the twelve months between the
arraignments and trial.

      Hoover also argues that his right to a fair trial was
compromised when the court declined his request to poll a second
time a juror who paused before acknowledging that he agreed with
the verdicts announced by the foreperson.   The court found that
there was only a short delay before the juror answered, that his
answer that the verdict was his verdict, albeit delayed, was
nevertheless "unequivocal," and that there was no need "to

- 32 -

especially call him out to'voir dire him."[10]   (Tr. of 7/8/04,

afternoon session, at 10-11); see United States v. O'Bryant, 775

F.2d 1528, 1535-36 (11th Cir. 1985) (finding no abuse of

discretion in failing to repoll jurors when there was no

expression of uncertainty).

    Hoover-Hankerson moves for a new trial on several additional

grounds'  One is insufficiency of the evidence, specifically,

that the government "did not show that [she] actually reached an

agreement with any alleged coconspirator."  (CHH Mot. at 9.)  A

new trial may be granted because of insufficiency of evidence

only in "exceptional cases in which the evidence weighs heavily

against the verdict."  Edmonds, 765 F. Supp. at 1118.  This is no

-such case, as the discussion above concerning the sufficency of

the evidence on the conspiracy count reveals.  In addition,

Hoover-Hankerson argues that the prosecutor made improper

comments in his rebuttal argument by stating that the jury should

"send a message that Ms. Hoover-Hankerson is not above the law."

(CHH Mot.at 14.)  The government disputes making the statement

(Gov't Opp'n at 10 n.9), and the transcript reveals that Hoover-

Hankerson's allegation is inaccurate.  While the government

stated that "lawyers who take an oath to uphold the law and who

_____

    [10] The poll had been completed forty minutes earlier   At
the time of Hoover's request, the jury was waiting to be called
back into court to receive supplemental instructions about
deliberating over a forfeiture verdict.

- 33 -

have a special trust . . . are not above the law" (Tr. of **7/7/04**,

afternoon session, at **59**), the government made no mention that

'the jury should send a message to Hoover-Hankerson.

Nevertheless, a new trial is not warranted if a **prosecutor**'s

statements are harmless.  **See** <u>United States v. Johnson</u>, 231 **F.3d**

43, 48 (D.C. Cir. 2000) (finding harmless prosecutor's statement

asking the jury to convict the defendant to protect others from

his **drug** dealing activities despite absence of curative

instruction because the court gave general instructions to

convict based only on the evidence and reminding jurors that

lawyers' arguments are not evidence); <u>see also Gatling</u>, 96 **F.3d**

'at **1524** (finding that prosecutor's exhortation to the jury that

it send a message to the defendant did not substantially

prejudice the defendant given the court's instruction that

closing arguments were not evidence).  Here, whether the

prosecutor's statements were proper or not, the court **did**

instruct the jury that the lawyers' comments were not evidence.

Hoover-Hankerson also argues that the government delayed

turning over certain financial documents but fails to identify

how those documents prejudiced her case or impeded her ability to

-prepare a defense.  **See** <u>United States v. Moseley</u>, 450 F.2d 506,

508-09 (5th Cir. 1971) (affirming denial of motion for new trial

based on government's failure to produce photographs **which**

- 34 -

defense counsel knew about, but did not request, even though the

photographs were subject to a pretrial discovery order).

Further, Hoover-Hankerson seeks a new trial claiming an

inability to have participated meaningfully in voir dire because

she could not see well during the voir dire process.

Notwithstanding the fact that she never objected during the voir

dire process professing any inability to see the proceedings, she

was present during the entire proceedings, listened to the

individual voir dire of veniremembers through a headset and

engaged counsel in conversation during the voir dire process.

She was by no means absent -- or effectively absent -- from the

proceedings so as to merit a new trial.   Cf. United States v.

Brest, 23 F.R.D. 103, 106-07 (W.D. Pa. 1958) (requiring new trial

because no evidence established the defendant's presence when the

jury was impaneled).

Hoover-Hankerson also asserts that the jurors had to wait a

business day for her to appear for jury selection and that her

appearance in a wheelchair had the potential to cause prejudice.

The jurors were never made aware that the reason for the delay

was Hoover-Hankerson's absence and she could not have been

prejudiced for that reason.   Hoover-Hankerson cites to no case

law to support her contention that her presence in a wheelchair

caused her prejudice rather than brought her sympathy.   In any

- 35 -

event, she does not allege that any substantial rights were

affected.  <u>See</u> <u>United States v. Johnson</u>, 769 F. Supp. 389, 395-96

(D.D.C. 1991), <u>rev'd on other grounds sub nom.</u>, United States v.

<u>Brawner</u>, No. 92-3208, 1996 WL 397478 (D.C. Cir. June 14, 1996).

<u>CONCLUSION AND ORDER</u>

The government produced sufficient evidence to prov beyond

a reasonable doubt that Hoover-Hankerson and Hoover were guilty

of Counts 1, 2, 4, and 5,  and that Hoover-Hankerson was uilty of

Count 3.  However,  the government did not produce **suffic** ent

evidence to prove that Hoover was guilty of Count 3.  Th refore,

it is hereby

ORDERED that defendant Hoover-Hankerson's motions f r

judgmen t of acquittal and for a new trial be, and hereby are,

DENIED.  It is further

ORDERED that defendant Hoover's motion for judgment of

acquitt l as to Counts 1, 2, 4, and 5 and for a new trie  be, and

hereby i , DENIED.  It is further

ORDERED that defendant Hoover's motion for judgment of

acquitt l as to Count 3 be, and hereby is, GRANTED. It  s

further

ORDERED that sentencing is scheduled for March 3, 2 06 at

11:30 a.m.  All supplemental sentencing memoranda must  filed

by February 22, 2006.  It is further

- 36 -

ORDERED that this matter be referred to the Probation Office

for preparation of supplemental presentence investigation

reports.

SIGNED this 30th day of December, 2005.

RICHARD W. ROBERTS
United States District Judge